# Exhibit C

CONFIDENTIAL

## BIOREACTOR DEVELOPMENT AGREEMENT

This Bioreactor Development Agreement (this "**Agreement**") is entered into as of August 10, 2021 ("**Effective Date**") by and between GOOD Meat, Inc., a Delaware corporation having its principal place of business at 2000 Folsom St., San Francisco, CA  94010 ("**GM**"); and ABEC, Inc., a Pennsylvania corporation with its principal place of business at 3998 Schelden Circle, Bethlehem, PA  18017 ("**ABEC**"). GM and ABEC are hereinafter referred to separately as a "**Party**" and jointly as the "**Parties**."

## RECITALS

WHEREAS, GM is a leading producer of cultured meat;

WHEREAS, ABEC designs, builds and sells bioreactors;

WHEREAS, GM and ABEC intend to collaborate on the development and manufacture of bioreactors with a minimum working volume of 100,000 liter bioreactors and a target working volume of 250,000 liter or larger (each, a "**100KL+ Bioreactor**"); and

WHEREAS, GM and ABEC have entered into this Agreement, which sets forth the terms and conditions for the above mentioned collaboration between GM and ABEC;

NOW, THEREFORE, in consideration of the foregoing recitals, the mutual agreements set forth hereinafter and the consideration and mutual benefits to be derived therefrom, the Parties agree as follows:

**1      DEFINITIONS**

1.1     "**Affiliate**" means, with respect to each Party, any legal entity other than such Party that is Controlled by such Party or under common Control with such Party only while and for so long as such Control exists.

1.2     "**ABEC Background IP**" means any and all Intellectual Property Rights of ABEC that are: (i) wholly or partially owned by, licensed to, or otherwise controlled by ABEC as of the Effective Date; and (ii) first invented, developed, or otherwise devised by or for ABEC before the Effective Date or outside the Project and without utilizing Confidential Information of GM.

1.3     "**ABEC Foreground IP**" means any and all Intellectual Property Rights of ABEC that are: (i) wholly or partially owned by, licensed to, or otherwise controlled by ABEC, after the Effective Date and (ii) first invented, developed, or otherwise devised by or for ABEC after the Effective Date within the Project solely to the extent pertaining to Cell Culture Bioreactor Technology. Notwithstanding anything to the contrary, ABEC Foreground IP will exclude all ABEC Background IP. For the avoidance of doubt, ABEC Foreground IP shall include all Intellectual Property Rights relating to cell culture equipment (bioreactors and supporting technology) and process automation developed by ABEC.

1.4     "**Bioreactor Technology Intellectual Property Right(s)**" means any and all Intellectual Property Rights relating to the research, development, design and construction of bioreactors, along with related supporting equipment, software and supporting technology.

1.5     "**Cell Culture Bioreactor Technology**" means a bioreactor, along with related supporting equipment, software and supporting technology intended, designed, and constructed for GMP cultivation of animal cells for food production.

CONFIDENTIAL

1.6     "**Cultured Meat Technology**" means the technology, processes and know-how concerning the cultivation of animal cells in a bioreactor for the purpose of cultivating meat.

1.7     "**Cultured Meat Technology Intellectual Property Right(s)**" means any and all Intellectual Property Rights relating to propagation and cultivation of animal cells, specific to cell lines cultivated for human consumption and associated process recipes and formulations.

1.8     "**Confidential Information**" of a Party means any information of the Disclosing Party disclosed to the other Party pursuant to this Agreement which is in written, graphic, machine readable or other tangible form and is marked "Confidential," "Proprietary" or in some other manner to indicate its confidential nature, or which, if disclosed orally or by demonstration, is identified at the time of initial disclosure as confidential and memorialized in writing within thirty (30) days of such disclosure and such writing is marked in a manner to indicate its confidential nature and delivered to the Receiving Party.  Confidential Information includes but is not limited to, the existence, content and subject matter of this Agreement, products, components, technical data, specifications, designs, drawings, models, processes, methods, techniques, software, algorithms, formulas, compositions, methodologies, rules and procedures, know-how, research, suppliers, financial information, contracts, product plans, business plans, business methods, business data, customers, markets, and marketing or competitive analysis.

1.9     "**Control**" means the ownership or other control, directly or indirectly, of fifty percent (50%) or more of the voting securities or other equity interests in any other person; or the power to appoint the majority of the members of the board of directors of any other person; or the power to cause the direction of management of any other person; or otherwise the actual control of any other person through ownership, whether based on contract, trustee or otherwise.

1.10    "**Deliverables**" means any items required to be delivered by one Party against the Requirements as specified in more detail in **Appendix 1** (Statement of Work) hereto.

1.11    "**Disclosing Party**" means a Party that discloses Confidential Information.

1.12    "**GM Background IP**" means any and all Intellectual Property Rights of GM that are: (i) wholly or partially owned by, licensed to, or otherwise controlled by GM as of the Effective Date; and (ii) first invented, developed or otherwise devised by or for GM before the Effective Date or outside the Project and without utilizing Confidential Information of ABEC.

1.13    "**GM Foreground IP**" means any and all Intellectual Property Rights of GM that are: (i) wholly or partially owned by, licensed to, or otherwise controlled by GM after the Effective; and (ii) first invented, developed, or otherwise devised by or for GM after the Effective Date within the Project pertaining to Cultured Meat Technology. Notwithstanding anything to the contrary, GM Foreground IP will exclude all GM Background IP.  For the avoidance of doubt, GM Foreground IP shall include all Intellectual Property Rights relating to Cultured Meat Technology.

1.14    "**GMP**" means Good Manufacturing Practice.

1.15    "**Intellectual Property Right(s)**" means any and all intellectual property rights and other like statutory rights including, without limitation, Patent Rights, copyright rights (including, without limitation, moral rights and the right to further transfer and modify such copyright rights), authors' rights, trademark rights, tradenames, rights of publicity, rights in data, trade secret rights, rights in know-how or other proprietary information, in each case irrespective of whether arising out of registration or otherwise as well as applications and the right to file for applications for any of the foregoing, contract and licensing rights, goodwill and all other intellectual property rights as may exist now and/or hereafter come into existence and all applications therefor and

CONFIDENTIAL

registrations, renewals and extensions thereof, regardless of whether such rights arise under the laws of the United States or any other state, country, jurisdiction or international treaty.

1.16    "**Milestone**" means a milestone into which delivery of Deliverables or other work may be divided and as further specified in the applicable Statement of Work.

1.17    **"Joint Intellectual Property Right(s)"** means any and all Intellectual Property Rights conceived, reduced to practice and/or developed jointly by the Parties in furtherance of the Project.  For the sake of clarity, Joint Intellectual Property Rights will not include ABEC Foreground IP, GM Foreground IP, ABEC Background IP or GM Background IP.

1.18    "**Patent Rights**" means any and all rights under any of the following, whether existing now or in the future: (i) any and all domestic, international or foreign patents, utility models, design registrations, certificate of inventions, patents of addition or substitution, or other governmental grants for the protection of inventions or industrial designs anywhere in the world, including any and all reissues, renewals, re-examinations or extensions thereof, and (ii) any and all applications for any of the foregoing, including any international, provisional, divisional, continuation, continuation-in-part, or continued prosecution applications.

1.19    "**Permitted Purpose**" means the purpose of performing development or other work on the part or on behalf of a Party in furtherance of the Project.

1.20    "**Person**" means an individual, corporation, limited liability company, partnership (whether general or limited), joint venture, trust (including a business trust or real estate investment trust), unincorporated organization, joint stock company, association, or other entity, or any government or any agency or subdivision of any government.

1.21    "**Project**" means the project described in the Statement of Work, as it may be amended in writing by the Parties from time to time.

1.22    "**Prototypes**" means the prototypes (if any) described in the Statement of Work.

1.23    "**Receiving Party"** means a Party that receives Confidential Information.

1.24    "**Requirements**" means GM's functional, non-functional and other requirements for the Deliverables as defined in the Statement of Work.

1.25    "**Statement of Work**" means the Statement of Work attached hereto as **<u>Appendix 1</u>** (Statement of Work), as it may be amended in writing by the Parties from time to time.

1.26    "**Third Party**" means a party other than any of the Parties and/or any of their Affiliates.

2    **PROJECT AND STEERING GROUP**

2.1    Neither Party will materially subcontract the development activities set forth in the Statement of Work without the advance written consent of the other Party; it being understood that the Parties may have subcontractors provided that the contracting Party continues to supervise the subcontractors in the development activities and shall remain responsible for compliance with this Agreement in connection with such development activities.  The Parties will work together towards completing the Project, participating as necessary in scheduled design review meetings and any other meetings necessary for completion of the same.

2.2    Each Party will timely prepare and provide to the other Party all Prototypes, other Deliverables and/or other results of the Project in keeping with the Statement of Work, the Milestones possibly set forth therein as well as in the way and form as set forth therein.  Each Party will keep the other Party continuously informed of the status and progress of as well as any possible delays or threatened delays with the Project.  Each Party will promptly report to the other Party the results of any analyses or other tests performed set forth in the Statement of Work, together with any

CONFIDENTIAL

comments concerning design changes or further development or remedial actions that may be needed.

2.3   Each Party will provide and maintain the necessary precautions, supervision, and safeguards for the safety of all persons performing any development or other work within the Project and will not cause or permit to exist an unlawful, hazardous, unsafe, unhealthy, or environmentally unsound condition over which such Party has control. Each Party's employees and agents will observe all rules that may be in effect regarding badges, safety, and conduct while at any facility of the other Party.

2.4   The Project will be supervised and governed by a steering group. Each of the Parties will appoint three (3) representatives to the steering group. The steering group will make decisions with unanimous consent by all of the Parties' representatives. The steering group will convene regularly and: (i) be tasked with monitoring the progress of the Project; (ii) has the right to decide on the personnel, subcontractor, material, equipment and other like resources allocated to the Project as well as to amend the Statement of Work, both in a manner being binding on the Parties; and (iii) has such other roles and responsibilities as may be set forth in the Statement of Work. In the event the steering group fails to reach unanimous consent on any matter under review, the Parties will escalate the matter to their respective CEOs for resolution.

**3   EXCLUSIVITY**

Except as expressly authorized in this Agreement and until the earlier of: (1) the start of Stage 5 of the Project (as defined in the Statement of Work) or (2) one (1) year following the termination of this Agreement, ABEC acknowledges and agrees that it will not produce, develop, test, research or otherwise commercialize or attempt to commercialize (whether internally or with any Third Party) any bioreactors exceeding 25,000 liters of working volume for the purpose of culturing animal cells for food production. Notwithstanding the foregoing, in no event shall such aforementioned restriction be effective after seven (7) years from the Effective Date.

**4   PAYMENTS**

4.1   Except as may be otherwise provided in the Statement of Work and below, each Party will bear its own costs for performing the tasks associated with the Project.

4.2   GM shall pay ABEC in accordance with the payment obligations set forth in the Statement of Work as ABEC performs the Project and delivers the Deliverables.

4.3   ABEC will submit invoices related to any amounts owed by GM to ABEC hereunder as may be agreed in the Statement of Work. GM will pay ABEC correctly invoiced amounts net thirty (30) days upon receipt of ABEC's invoice.

4.4   All stated prices are exclusive of any taxes. ABEC may assess and retain any applicable sales taxes unless GM provides a valid sales tax exemption certificate.

4.5   Payment shall not constitute an acceptance of any Deliverables or other results of the Project. ABEC will provide wire instructions/account information and/or make changes thereto by written notice to GM.

4.6   Following the completion and validation of Stage 4 of the Project as specified in the Statement of Work and as determined by GM in its sole judgment, if and as applicable, GM agrees to purchase a minimum of two-million liters (2,000,000 L) of production 100KL+ Bioreactors (i.e., not Prototype), inclusive of the associated seed bioreactors.

4.7   Deliverables provided by ABEC for Stages 4 and 5 are subject to mutually agreed upon Factory Acceptance Testing (FAT), which shall be subject to the review and approval of the steering group.

CONFIDENTIAL

## 5    CONFIDENTIALITY

5.1    The Receiving Party will: (a) protect Confidential Information received by it from the Disclosing Party with the same degree of confidential treatment that it provides for its own similar proprietary and confidential information, which will not be less than the care a reasonable person would exercise under similar circumstances, (b) restrict access to such Confidential Information to such of its employees who have a need to know it to perform any development activities or other work within the Project or to effectuate its rights and obligations under this Agreement, (c) not use such Confidential Information for any purpose other than the Permitted Purpose, and (d) refrain from disclosing such Confidential Information to any Person unless (i) disclosure to such Person is needed to benefit the Project or to effectuate the Receiving Party's rights and obligations under this Agreement and (ii) such Person is bound by a written agreement including confidentiality obligations at least as restrictive as those contained in this Agreement.

5.2    Notwithstanding any other provision of this Agreement, the Receiving Party may disclose Confidential Information of the Disclosing Party, and without liability for such disclosure if in compliance with Section 5.3 below, to the extent that such disclosure is: (i) required to be made pursuant to applicable law, rule, regulation, government authority, duly authorized subpoena, or court order; (ii) required to be made to a court or other tribunal in connection with the enforcement of the Receiving Party's rights under this Agreement; or (iii) approved by the prior written consent of the Disclosing Party.

5.3    If the Receiving Party receives a subpoena or otherwise becomes aware of events that may legally require it to disclose Confidential Information of the Disclosing Party, it will (if not prevented by law) promptly notify the Disclosing Party and cooperate with the Disclosing Party (at the Disclosing Party's expense) to obtain a protective order or other order preventing or restricting such disclosure or eliminating or limiting the scope of such subpoena or legal requirement.

5.4    The rights and obligations under this Section 5 with respect to any Confidential Information will survive for a period of five (5) years from the conclusion of the Project, where the Confidential Information in question was exchanged.  Notwithstanding the foregoing, the Receiving Party's duties under this Agreement with respect to trade secrets of the Disclosing Party shall survive in accordance with applicable law.  The restrictions on disclosure and use of Confidential Information contained in this Agreement shall not apply to any information acquired by the Receiving Party which: (a) was publicly known and generally available to the public at the time of disclosure, or which becomes available to the public other than through an act of omission of the Receiving Party; (b) was already known to the Receiving Party prior to its receipt from the Disclosing Party; (c) is lawfully obtained at any time from a Third Party under circumstances permitting its use or disclosure to others; or (d) is independently developed by the Receiving Party without use of the Disclosing Party's Confidential Information; or (e) is disclosed with the prior written consent of the Disclosing Party.

5.5    Upon the request of the Disclosing Party following the termination or expiration of this Agreement and after the conclusion of the Project, or upon earlier request, the Receiving Party will promptly return or destroy all of the Disclosing Party's Confidential Information in the Receiving Party's possession or control, provided that the Receiving Party may retain one (1) legal file copy and will not be required to destroy electronic back-up copies made in the ordinary course of business, so long as the Receiving Party does not use such copies following termination or expiration of this Agreement.

5.6    Except as provided in Section 5.2, neither Party will disclose to any Third Party or make public the existence and content of this Agreement, or the negotiations leading to or pursuant to this Agreement without the advance written consent of the other Party.  However, each Party may disclose the terms and conditions of this Agreement:  (i) as required by any court or other

CONFIDENTIAL

governmental body; (ii) as required by the rules and regulations of any national securities exchange, NASDAQ, or other market on which its securities are listed or qualified, the Securities and Exchange Commission or other applicable governmental or regulatory body; (iii) as otherwise required by law; (iv) to legal counsel of the parties; (v) in confidence, to accountants, banks, and financing sources and their advisors; (vi) in connection with the enforcement of this Agreement or rights under this Agreement, or (vii) in confidence, in connection with an actual or proposed merger, acquisition, or similar transaction.

5.7   Each Party acknowledges that due to the unique nature of the Confidential Information, any breach of the restrictions contained in this Section 5 is a material breach of this Agreement which may cause irreparable harm and the Disclosing Party may not have an adequate remedy in money or damages in such an event. Any such breach shall entitle the Disclosing Party to seek injunctive relief in addition to all remedies that may be available in law, in equity or otherwise.

## 6   INTELLECTUAL PROPERTY

6.1   GM will retain its ownership of all GM Background IP and shall retain the ability to grant rights, licenses, and submit applications for patents and copyright registrations on its GM Background IP at its sole discretion. GM hereby grants to ABEC a non-transferable, non-exclusive, royalty-free, revocable and limited license to use the GM Background IP contained in the Deliverables solely for the Permitted Purpose and for no other purpose during the term of this Agreement.

6.2   GM will retain its ownership of all GM Foreground IP and shall retain the ability to grant rights, licenses, and submit applications for patents and copyright registrations on its GM Foreground IP at its sole discretion. GM hereby grants to ABEC a non-transferable, non-exclusive, royalty-free, revocable and limited license to use any GM Foreground IP solely for the Permitted Purpose and for no other purpose during the term of this Agreement.

**6.3**   ABEC will retain its ownership of all ABEC Background IP and all ABEC Foreground IP, and ABEC shall retain the ability to grant rights, licenses, and submit applications for patents and copyright registrations on its ABEC Background IP and ABEC Foreground IP at its sole discretion. ABEC hereby grants to GM a worldwide, royalty free, fully paid-up, non-exclusive license and right to use ABEC Background IP and ABEC Foreground IP for: (a) the Permitted Purpose and (b) GM to build cultured meat production at the facility housing 100KL+ Bioreactors for GM and its Affiliates only, but not for any other Person or Third Party.

6.4   All Joint Intellectual Property Rights shall be owned jointly by ABEC and GM. The Parties shall cooperate with each other and take all actions and execute all documents necessary to prepare, prosecute, record and perfect ownership of Joint Intellectual Property Rights.

6.4.1   ABEC shall have the sole and exclusive right, even as to GM, to make, use, sell and license Bioreactor Technology Intellectual Property Rights. For the sake of clarity, GM shall not make, use, sell or license Bioreactor Technology Intellectual Property Rights.

6.4.2   GM shall have the sole and exclusive right, even as to ABEC, to make, use, sell and license Cultured Meat Technology Intellectual Property Rights. For the sake of clarity, ABEC shall not make, use, sell or license Cultured Meat Technology Intellectual Property Rights.

6.4.3   All costs and expenses for preparation, prosecution, recordation and all other fees for perfecting ownership of Bioreactor Technology Intellectual Property Rights shall be borne by ABEC.

CONFIDENTIAL

6.4.4   All costs and expenses for preparation, prosecution, recordation and all other fees for perfecting ownership of Cultured Meat Technology Intellectual Property Rights shall be borne by GM.

6.4.5   In the event that Joint Intellectual Property Rights (e.g., patent application) relates to both Bioreactor Technology Intellectual Property Rights and Cultured Meat Technology Intellectual Property Rights, each Party shall bear 50% of the costs and expenses for preparation, prosecution, recordation and all other fees for perfecting ownership of such Joint Intellectual Property Rights.

6.4.6   Each Party shall report to the other Party not less than twice per year (approximately six months apart), on the progress of the prosecution of Joint Intellectual Property rights.

6.4.7   The Parties shall cooperate with each other in connection with any claim, suit or proceeding relating to enforcement and/or defense of Joint Intellectual Property Rights and shall keep each other reasonably informed of all material developments in connection with any such claim, suit or proceeding.

6.5   Other than the express licenses and assignments granted under Section 6 in this Agreement, no other or broader license, assignment, right or immunity is granted, whether expressly, impliedly, by estoppel or otherwise, under any Intellectual Property Rights owned, controlled or otherwise licensable by either Party or merely by virtue of the disclosure of Confidential Information hereunder.

6.6   The grant of each license hereunder includes the right to grant sublicenses within the scope of such license by GM and ABEC to their respective current and future Affiliates (including, for clarity, their respective subsidiaries), for so long as they remain its Affiliates. This sublicense right is not subject to the other Party's approval.

6.7   Neither Party will use any trademarks, tradenames, company names, domain names or other like identifiers of the other Party in any manner without the prior written consent of such other Party.

6.8   Prior to the delivery of the respective Deliverables to the other Party, each Party shall use commercially reasonable efforts to identify Intellectual Property Rights of any Third Party that will be included in the Deliverables.

6.9   Each Party will execute such assignments or other documents reasonably required and requested by the other Party to evidence and perfect the assignments granted hereunder.

## 7    REPRESENTATIONS AND WARRANTIES

7.1   Each Party represents and warrants that: (a) it is a legal entity duly incorporated, validly existing, and in good standing under the laws of its jurisdiction of incorporation; (b) it has the power and authority to enter into and perform its obligations under this Agreement; and (c) entering into this Agreement does not violate any agreement or obligation existing between such Party and any other Person.

7.2   Each Party represents and warrants to the other Party that in performing the Project it will not disclose or use any confidential information of any Third Party or produce or develop any Prototypes, other Deliverables or other results of the Project containing or otherwise utilizing any Intellectual Property Rights or confidential information of any Third Party without authorization for such use, unless and only to the extent the Parties have expressly agreed on the same in the Statement of Work.

CONFIDENTIAL

7.3     ABEC represents and warrants to GM that all Deliverables, Prototypes and other results of the Project provided by ABEC to GM will be free and clear of all liens, security interests, and other encumbrances that would affect the ability of the same to be used for the Permitted Purpose.

7.4     ABEC warrants to GM that it: (a) will perform the Project in good, timely and workmanlike manner and with professional skill and diligence; (b) will not use equipment, materials or other items in performance of the Project that would be unsuitable for such use; (c) will perform the Projects in full compliance with all applicable laws, regulations, orders, and other applicable requirements; (d) possesses or will have the technical skills and experience required to duly and timely perform the Project; and (e) will dedicate such time, personnel, and other resources as are reasonably necessary to perform the Projects timely and in accordance with the Statement of Work.  Notwithstanding the forgoing, the parties acknowledge and agree that the Project relates to the development of a new product and there is no guaranty or assurance that such product may be able to be developed and/or manufactured as currently desired by GM.

7.5     ABEC represents and warrants to GM that all Stage 5 Deliverables provided by ABEC to GM will comply with and perform in accordance with the Requirements for a period of twelve (12) months.

7.6     In the event either Party discovers a breach of any of the foregoing covenants, representations and warranties of this Section 7 by the other Party, the non-breaching Party shall notify the breaching Party, and the Party breaching the warranty shall use commercially reasonable efforts to reperform the respective task and/or redeliver the respective Deliverable so as to correct the breach.

**8       INDEMNIFICATION**

8.1     If in the performance of this Agreement, an agent or employee of ABEC enters into any premises of GM, ABEC will indemnify, hold harmless and defend, at its sole cost and expense, GM against all claims and liabilities incurred in connection with or arising out of injury to or death of any person or damage to property of any kind, to the extent that such injury, death, or damage is caused by any negligent act or omission, or willful misconduct, on the part of such ABEC agents or employees in connection with such entry into GM premises.

8.2     If in the performance of this Agreement, an agent or employee of GM enters into any premises of ABEC, GM will indemnify, hold harmless and defend, at its sole cost and expense, ABEC against all claims and liabilities incurred in connection with or arising out of injury to or death of any person or damage to property of any kind, to the extent that such injury, death, or damage is caused by any negligent act or omission, or willful misconduct, on the part of such GM agents or employees in connection with such entry into ABEC premises.

**9       TERM AND TERMINATION**

9.1     This Agreement enters into effect on the Effective Date and shall remain in full force until the completion of all the Project, unless terminated pursuant to the terms below.

9.2     Either Party may terminate this Agreement for convenience upon written notice upon thirty (30) days' prior written notice to the other Party.

9.3     Either Party may terminate this Agreement with immediate effect upon written notice to the other Party under the following circumstances: (i) the other Party commits a material breach of its obligations under this Agreement and does not fully remedy such breach by a specified date, which shall be no earlier than thirty (30) days after the date of the terminating Party's written notice thereof; or (ii) either Party: a) enters into any form of bankruptcy, insolvency, or similar proceeding; b) is liquidated, dissolves, ceases to do business or otherwise ceases to conduct its operations in the normal course of business.

CONFIDENTIAL

9.4 <u>Sections 1</u> (Definitions), <u>3</u> (Exclusivity), <u>5</u> (Confidentiality), <u>6</u> (Intellectual Property), <u>7</u> (Representations and Warranties), <u>8</u> (Indemnification), <u>9</u> (Term and Termination), and <u>10</u> (Miscellaneous) shall survive any expiration, termination or other cessation of this Agreement, (x) with respect to Sections <u>3</u> (Exclusivity) and <u>5</u> (Confidentiality), for the respective periods set forth therein, and (y) with respect to <u>7</u> (Representations and Warranties), <u>9</u> (Term and Termination), for a period of twelve (12) months following such expiration, termination or other cessation of this Agreement.

9.5 In the event that ABEC is unable or unwilling to manufacture 100KL Bioreactors, GM shall have the right to use all ABEC Foreground Intellectual Property Rights arising out of this Agreement to manufacture 100KL+ Bioreactors solely for its own use to manufacture cultured meat. GM shall not use ABEC Foreground Intellectual Property Rights arising out of this Agreement to enable a third-party to manufacture 100KL+ Bioreactors for anyone other than GM for its use to manufacture cultured meat.

## 10   MISCELLANEOUS

10.1 Deliverables under this Agreement may be subject to the export control laws of the country from which shipment is made or those of the United States. GM may be required to seek and obtain export licenses and authorizations for the shipment of Deliverables. With respect to each Deliverable, ABEC shall assist GM in ascertaining the export classification and the potential applicability of U.S. export control laws, on its invoice, and ABEC shall provide Buyer: (i) with what ABEC believes is the correct classification, under local and U.S. laws, of the product being shipped and (ii) a statement as to the country of origin of the Deliverable.

10.2 To the extent there are any conflicting provisions within this Agreement, such conflicting provisions shall prevail in the following order: (i) provisions of the Statement of Work; and (ii) provisions of this main document. To the extent that there is a conflict between the terms and provisions of this Agreement and any ABEC purchase order executed in connection with this Project, the terms of the ABEC purchase order shall control.

10.3 All notices required or permitted under this Agreement shall be in writing and shall be deemed delivered to a Party (i) on the date when delivered personally or by courier or messenger (ii) on the next business day, when deposited with a recognized overnight courier service, or (iii) three (3) calendar days after the date of deposit in the United States mail, with first class postage prepaid and a copy sent by email or facsimile transmission. All notices shall be sent to the addresses set forth below or to such other address as may be specified by either Party to the other in accordance with this Section. Either Party may change its address for notices under this Agreement by giving written notice to the other Party by the means specified in this Section.

| If to GM: | If to ABEC: |
|---|---|
| GOOD Meat, Inc.<br>2000 Folsom St.<br>San Francisco, CA 94010<br>Attention: Legal | ABEC, Inc.<br>3998 Schelden Circle<br>Bethlehem, PA 18017<br>Attention: Jim Lynch, CFO |
| Email: notices@ju.st | Email: jlynch@abec.com |

10.4 No failure to exercise, nor any delay in exercising, on the part of either Party, any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy prevent any further exercise thereof or the exercise of any other right or remedy.

CONFIDENTIAL

10.5   If, at any time, any provision hereof is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions hereof nor the legality, validity or enforceability of such provision under the law of any other jurisdiction shall in any way be affected or impaired thereby. The invalid provision shall be replaced by a valid one, which achieves to the extent possible the original purpose and commercial goal of the invalid provision.

10.6   This Agreement constitutes the entire agreement between the Parties with respect to the subject matter of this Agreement and, except as expressly contemplated herein, supersedes all prior agreements, commitments, understandings and negotiations, both written and oral, between the Parties with respect to the subject matter of this Agreement. Any provision of this Agreement may be amended only if such amendment is in writing and duly executed by the Parties. Any amendment hereto shall be in the English language.

10.7   This Agreement shall be governed by the substantive laws of the State of Delaware without reference to any conflicts of laws provisions. The United Nations Convention on Contracts for the International Sale of Goods shall not apply.

10.8   Any dispute, controversy or claim arising out of or in connection with this Agreement, or the breach, termination or invalidity thereof, shall be finally settled by arbitration in accordance with the Commercial Arbitration Rules and Mediation Procedures of the American Arbitration Association. The arbitral tribunal shall be composed of three (3) arbitrators, one (1) selected by GM, one (1) selected by ABEC and one (1) mutually agreed upon between the Parties. The seat of arbitration shall be Wilmington, DE.

[SIGNATURES PAGE FOLLOWS]

CONFIDENTIAL

IN WITNESS WHEREOF, the Parties have caused this Agreement to be signed in duplicate originals by their duly authorized officer or representatives as of the Effective Date.

**"GM"**                                    **"ABEC"**

**GOOD Meat, Inc.**                         **ABEC, Inc.**

By: _____          By: _____
Name: Josh Tetrick                          Name: SCOTT PICKERING
Title: CEO                                  Title: CEO
Date: 8/9/2021                              Date: 8/10/2021

*[Signature Page to Bioreactor Development Agreement]*

## Appendix 1

### Statement of Work

This Statement of Work (this "**Statement of Work**" or "**SOW**") is entered into as of August 10, 2021 ("**SOW Effective Date**") by and between GOOD Meat, Inc. ("**GM**"); and ABEC, Inc., ("**ABEC**") pursuant to that certain Bioreactor Development Agreement by and between GM and ABEC dated as of August 10, 2021 ("**Bioreactor Development Agreement**"). All defined terms used in this SOW but not defined herein shall have the meanings set forth in the Bioreactor Development Agreement.

ABEC and GM have initiated a partnership for the development and potential supply of cell culture bioreactors to meet GM's growing production needs. Projects to provide bioreactors at both pilot (up to 6,000L) and demonstration (up to 25,000L) working volume are currently underway. In addition, ABEC has committed to propose a plan to design and develop bioreactors with a minimum working volume of 100,000L and a target working volume of 250,000L or more ("**100KL+ Bioreactors**").

100KL+ Bioreactors would be new to the animal cell culture life sciences industry. ABEC has identified the following general areas of investigation for design and development:

- Large-Scale Sanitary Design
- Mixing/Mass Transfer/Scale-Up
- Heat Transfer/Stress/Vibration
- Automation/Instrumentation
- Construction/Fabrication/Installation
- Seed train development
- Support Equipment (Media Prep/Delivery, Reagent Addition, Harvest)
- Development of design standards and protocols that account for sterility requirements and food GMPs

ABEC proposes the following staged approach to address the above areas and ultimately provide a viable design with firm pricing as well as proof of concept and production Bioreactors.

- Stage 1 – Feasibility (2-4 months): Understand the current GM cell culture process, establish GM's performance and production targets, and perform initial 100KL+ Bioreactor design feasibility study.
- Stage 2 – Conceptual Design (4-8 months): Develop a conceptual 100KL+ Bioreactor design, budgetary pricing for future Stages, and develop facility requirements to support first 100KL+ Bioreactor.
- Stage 3 – Design Validation (6-12 months): Finalize the 100KL+ Bioreactor detailed design, provide firm pricing for Stage 4 and refine facility requirements to support first 100KL+ Bioreactor.
- Stage 4 – Proof of Concept (20-28 months): Construct and test first 100KL+ Bioreactor. First pricing for Stage 5.
- Stage 5 – Full Scale Production Capacity (24-36 months): Construct, install, and commission ≥ 2,000,000L of Bioreactor capacity (inclusive of seed train bioreactors).

ABEC will establish a multi-disciplinary team with dedicated resources as well as support resources to execute the design development. ABEC will work collaboratively with GM through regular reviews during each stage. Upon completion of each Stage (or earlier as GM and ABEC agree), ABEC will confirm pricing and GM will provide formal approval and funding to proceed to subsequent Stages. Some of these Stages

may occur in parallel in part or in whole depending on resource availability, schedule needs, and GM risk tolerance.

It is understood that as a development effort there are various technical and commercial unknowns. The time ranges shown above reflect the realities of design uncertainties as well as the potential for GM to drive project acceleration through more aggressive investment within a Stage and added risk through overlapping Stages.

Funding for the Bioreactor Design and Development effort will be designed to both compensate ABEC for the design, development, and execution efforts as they occur as well as to establish a significant ABEC equity stake in GM to strengthen the partnership and drive toward mutual success of the overall effort. ABEC will provide a price for each Stage that will align with the value ABEC would typically attribute to a partner-based product development and execution effort. In addition, GM will provide ABEC an equity stake at the initiation of each Stage of the project to ensure mutual success resulting from the development efforts. Stages 1 & 2 will be priced with this proposal. Stages 3, 4, and 5 will be priced as the results of the previous Stages provide insight to the needs in Stage 3 and beyond. Each stage will have a set equity stake (percent of ownership) associated with initiation.

GM will have the option to deny progression to the next Stage at any point in the project. The pricing as committed based on milestones in each Stage and equity as committed based on milestone for each Stage will still be due to ABEC but GM will not be obligated to move forward to the next Stage(s) if the success of the development efforts or the economics of the resulting product do not meet the needs of the business.

DEVELOPMENT ACTIVITIES AND DELIVERABLES

STAGE 1 – FEASIBILITY

During Stage 1, ABEC and GM will set goals for process performance and Cost of Goods Sold (COGS). ABEC will also perform initial feasibility work on Bioreactor design.

Specific Activities/Deliverables:
1. Analysis of current GM cell culture process
    a. Critical process variables, process constraints/windows, batch record reviews
    b. Possible testing in current equipment to determine limits
2. Initial scale-up analysis
3. Establishment of agitation/aeration requirements
4. COGS analysis
5. Investigation of Ultra Large-Scale instruments/components and materials of construction
6. Technical Risk Assessment
7. Future Stages Cost and Schedule Update

STAGE 2 – CONCEPTUAL DESIGN

During Stage 2, ABEC will develop a conceptual design for the Bioreactors and provide budgetary pricing for the equipment.

Specific Activities/Deliverables:
1. Initial Bioreactor P&ID's
2. Agitator and Aeration System Design
3. CIP and SIP Conceptual Design
4. Materials and Finishes specification development

5.  Initial 2D Layout – Plan and Elevation
6.  Initial CFD Modeling
7.  Utility Requirements Analysis
8.  Establish Ultra Large-Scale instrument and component supply chain
9.  Preliminary automation system architecture
10. Fabrication/Construction/Installation Assessment
    a.  ABEC factory versus field construction
    b.  Indoor versus outdoor installation
    c.  Modular concepts/shipping
11. Support Equipment definition and sizing
    a.  Media Prep/Delivery, Reagent Additions, Harvest
12. Conceptual Design Risk Assessment
13. Budgetary pricing of Bioreactor
14. Future Stages Cost and Schedule Update

STAGE 3 – DESIGN VALIDATION

During Stage 3, ABEC will finalize the Bioreactor design and provide firm equipment pricing.

Specific Activities/Deliverables:
1.  P&ID development to Issued for Design (IFD)
    a.  Bioreactors
    b.  Media, Additions, Harvest
2.  IFD 2D Layout – Plan and Elevation
3.  Prototyping/testing of components and/or subsystems as needed – Actual scope TBD based on
    Conceptual Design
4.  Structural/Vibrational/Stress Finite Element Analysis (FEA) – Actual scope TBD based on
    Conceptual Design
5.  Heat Transfer calculations
6.  Additional CFD Modeling – Actual scope TBD based on Conceptual Design
7.  Fabrication/Construction/Installation Plan
8.  Preliminary Utility Requirements
9.  Final Automation System Architecture
10. Electrical Architecture
11. Firm Pricing
12. Future Stages Cost and Schedule Update

STAGE 4 – PROOF OF CONCEPT

During Stage 4, ABEC will construct and test the first 100KL+ Bioreactor.

Specific Activities/Deliverables:
1.  Equipment 3D Modeling
2.  Material Procurement
3.  Fabrication/Construction/Installation
4.  Performance Testing
    a.  Cleaning and Sterilization
    b.  Mixing and Mass Transfer
    c.  Process Control – Temperature, pressure, pH, dissolved oxygen
5.  Stage 5 Cost and Schedule Update

STAGE 5 – FULL SCALE PRODUCTION CAPACITY

During Stage 5, ABEC will construct, install, and commission ≥ 2,000,000L of Bioreactor capacity.

Specific Activities/Deliverables:
1. Seed and Production Bioreactors
2. Support Equipment TBD
3. Factory Acceptance Testing (if applicable)
4. Shipping
5. Site Installation, Start Up, and Site Acceptance Testing
6. Ongoing Service and Support

PROJECT ORGANIZATION

ABEC will establish a dedicated, multi-disciplinary and cross-functional team to execute the project, leveraging experts from all ABEC functional groups. The functional organization for the project is shown below.



1 – 4

PRICING

| Item No. | Description | Price | Equity |
|---|---|---|---|
| 1 | Stage 1 of 100KL+ Bioreactor Design and Development | $800,000 | 0.5% |
| 2 | Stage 2 of 100KL+ Bioreactor Design and Development | $1,400,000 | 0.5% |
| 3 | Stage 3 of 100KL+ Bioreactor Design and Development | TBD (Budgetary = $3,000.00) | 1% |
| 4 | Stage 4 of 100KL+ Bioreactor Design and Development | TBD | 1% |
| 5 | Stage 5 of 100KL+ Bioreactor Design and Development | TBD | 2% |

PAYMENT SCHEDULE

***Payment Schedule for cash portion of consideration:***

Payment terms will be as follows for Stages 1 – 3:

50% upon receipt and acceptance of purchase order
50% upon 12 weeks after receipt and acceptance of purchase order

Payment terms will be as follows for Stages 4 & 5:

35% upon receipt and acceptance of Purchase Order
20% upon ABEC receipt of Vessel Heads and Shell materials
25% upon completion of Vessels
15% upon ready for Factory Acceptance Testing (FAT)
5% on completion of Site Acceptance Testing, not to exceed 120 days from ready for FAT date

Payment Terms are Net 30 days. All payments are net to ABEC – no taxes or duties are included.

***Payment Schedule for equity portion of consideration:***

Payment terms of equity shall be as follows:

GM shall issue the requisite number of shares of its common stock equal to the percentage ownership of GM set forth in the table above (determined as of the date of issuance on a fully diluted basis) upon the acceptance by GM and ABEC of the corresponding purchase order for each Stage for Stages 1 through 3 and, with respect to each of Stages 4 and 5, upon successful Factory acceptance testing. Such shares of common stock shall be duly authorized, validly issued, fully paid and non-assessable and free of all taxes, liens and charges created by GM.

Beginning at the time of the initial issuance of shares by GM to ABEC and until the parties agree otherwise, ABEC disposes of a majority of its holdings in GM or GM has a liquidation event, GM shall provide (i) quarterly financial summaries, (ii) a summary of Board meetings, excluding any confidential or sensitive information and (iii) hold steering group meetings with ABEC.

Additionally, beginning at the time of the initial issuance of shares by GM to ABEC and until the parties agree otherwise, ABEC disposes of a majority of its holdings in GM or GM has a liquidation event, the GM hereby covenants and agrees as follows:

1.  GM will furnish the following reports to ABEC:

    1(a) within one hundred twenty (120) days after the end of each fiscal year of GM, a balance sheet of GM and its subsidiaries, if any, as at the end of such fiscal year, and statements of income, cash flows and stockholders' equity of GM and its subsidiaries, if any, for such fiscal year, prepared in accordance with generally accepted accounting principles consistently applied.

    1(b) within forty-five (45) days after the end of the first, second and third quarterly accounting periods in each fiscal year of GM, an unaudited balance sheet of GM and its subsidiaries, if any, as of the end of each such quarterly period, and statements of income and cash flows of GM and its subsidiaries, if any, for such period, prepared in accordance with generally accepted accounting principles consistently applied (except that such financial statements may be subject to normal year-end adjustments and may not contain all footnotes required by generally accepted accounting principles).

2.  If GM registers any class of its common stock, such registration shall include the registration of the GM stock issued hereunder to ABEC. Further, as to ABEC's general rights as a Class A Common Stockholder of GM, GM cannot amend the rights of any class of its stockholders as set forth in its certificate of incorporation in a manner that affects any stockholders or group of stockholders within that class adversely without the approval of such group (per DGCL 242).

3.  In the event that Eat Just, Inc. shall sell any of its common stock of GM, it shall notify ABEC in writing ("Notice"), and ABEC shall have the right to participate in such sale by Eat Just, Inc. of GM common stock by selling ABEC's pro rata portion in such sale on the same terms and conditions as specified in the Notice. To the extent that ABEC exercises such right of participation, the number of shares of GM Common Stock that Eat Just, Inc. may sell shall be correspondingly reduced. ABEC shall provide notice of its participation in such sale within 5 business days of receipt of the Notice.

4.  ABEC shall have the right to participate in future financing rounds of GM.

[SIGNATURES PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties have caused this Statement of Work to be signed in duplicate originals by their duly authorized officer or representatives as of the SOW Effective Date.

**"GM"**                                                    **"ABEC"**

**GOOD Meat, Inc.**                                         **ABEC, Inc.**

By: _____                                By: _____
Name: Josh Tetrick                                         Name: SCOTT PICKERING
Title: CEO                                                 Title: CEO
Date: 8/9/2021                                             Date: 8/10/2021

*[Signature Page to Statement of Work to Bioreactor Development Agreement]*