IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ABEC, INC., <br>                 **Plaintiff,** <br><br> v. <br><br> EAT JUST, INC. AND GOOD MEAT, INC., <br>                 **Defendants.** | CIVIL ACTION <br><br><br> NO.  23-1091 |

**MEMORANDUM OPINION**

Plaintiff ABEC, Inc. ("ABEC") alleges that Defendants Eat Just, Inc. ("Eat Just") and GOOD Meat, Inc. ("GOOD Meat") (together, "Defendants") have failed to pay it over $100 million in cash and stock for machines that it built for them to grow cultivated meat.  Defendants move to compel arbitration or, in the alternative, dismiss the Amended Complaint.  Fed. R. Civ. P. 12(b)(6).  For the reasons set forth below, GOOD Meat's motion to compel arbitration will be denied, and Eat Just's motion to stay the case pending arbitration will be denied too.  Finally, both of Defendants' Motions to Dismiss will be granted in part and denied in part.

## I. FACTUAL BACKGROUND[1]

ABEC is an "the industry leading large scale cell culture development company."  It builds bioreactors, which are used in the development of cultivated meat—in this case, cultivated chicken.  These machines—large vessels that are used to grow organic material—are used to harvest cell cultures from animals and turn them into meat products that can be sold.

Starting in 2021, ABEC entered into a series of agreements with Defendants, which develop and market plant-based alternatives to animal-based foods.

---

[1] The facts set forth herein are taken from Plaintiff's Amended Complaint, plausible and non-conclusory allegations from which the Court is obligated to take as true at this stage in the litigation.  *Rivera v. Monko*, 37 F.4th 909, 917 (3d Cir. 2022) (citation omitted).

1

### A. The Pilot Plant Agreement

The first such agreement (the "Pilot Plant Agreement") entered into in June 2021 between ABEC and Eat Just was to construct, for $14.7 million, a "[b]ioreactor growth suite for pilot scale plants" in Alameda, California and Singapore. Purchase order 187859, written on letterhead for the "JUST" company, was recorded on Eat Just paperwork, signed by an individual with an Eat Just email address, and was to be billed to GOOD Meat's address.

### B. The Bioreactor Development Agreement

Two months later, ABEC entered into a separate, more extensive contract with GOOD Meat. Under this contract (the "Bioreactor Development Agreement"), ABEC was to design and develop a 100,000-to-250,000-liter bioreactor. The contract was divided into five stages across thirty-six months, from feasibility through design validation to construction, installation, and commissioning. Payment, in the form of both cash and shares of GOOD Meat common stock, was divided between these five stages as well. GOOD Meat's payment obligations were triggered by receipt and acceptance of ABEC's purchase orders and ABEC's completion of certain deliverables under the contract. GOOD Meat also had to provide ABEC with certain information going forward, including quarterly financial updates and board meeting summaries.

The contract included a choice-of-law provision such that it was to be "governed by the substantive laws of the State of Delaware without reference to any conflicts of laws provisions," as well as an arbitration provision that read:

> Any dispute, controversy or claim arising out of or in connection with this Agreement, or the breach, termination or invalidity thereof, shall be finally settled by arbitration in accordance with the Commercial Arbitration Rules and Mediation Procedures of the American Arbitration Association. The arbitral tribunal shall be composed of three (3) arbitrators, one (1) selected by [GOOD Meat], one (1) selected by ABEC and one (1) mutually agreed upon between the Parties. The seat of arbitration shall be Wilmington, DE.

It also included an integration clause stating that the instrument "constitutes the entire agreement between the Parties with respect to the subject matter of this Agreement and, except as expressly contemplated herein, supersedes all prior agreements . . . with respect to the subject matter of this Agreement."

### C. Amendments to the Bioreactor Development Agreement

According to the Amended Complaint, "[b]y the end of 2022, [D]efendants had issued approximately $280 million worth of work in purchase orders and agreed changes to ABEC" under the Bioreactor Development Agreement "and had reserved production capacity to support over $550 million of work." But GOOD Meat had trouble complying with its payment obligations, so in early 2023, the parties agreed to certain amendments to the Bioreactor Development Agreement (the "Amendments").

In the opening recitals to the Amendments, GOOD Meat concedes that "ABEC has performed services and is due payment" for certain invoices.[2] It also notes that the parties "have agreed to amend and modify certain of the terms and conditions of the Purchase Orders and" the Bioreactor Development Agreement. By way of these amendments, GOOD Meat agreed to pay almost $38 million for the invoices identified as "past-due" or "recent past-due" according to a payment schedule and "ratifie[d] and reaffirm[ed] the validity, enforceability and binding nature of its obligation to pay . . . in full." It also conceded the validity and binding nature of certain invoices that would be due soon.[3] If GOOD Meat "fail[ed] to timely make any of the payments in full . . . "all amounts with respect to" the invoices "shall automatically be immediately due and

---

[2] Invoices 24536, 24608, 24612, 24686, and 24733 (together, the "Past-Due Invoices"), worth about $35.1 million combined; and invoices 24752, 24768, 24769, 24771, 24772, and 24773 (together, the "Recent Past-Due Invoices"), worth about $2.6 million combined.

[3] Invoices 24817, 24818, and 24834 (together, the "Current Invoices").

payable without any further action by any party," and ABEC could terminate the contract notwithstanding the notice procedure laid out in the Bioreactor Development Agreement. Moreover, in such an instance, "**ABEC may pursue any and all rights and remedies against [GOOD Meat], at law or in equity**, with respect to" the invoices mentioned (emphasis added). The Amendments also granted ABEC one-year extensions on the delivery dates for certain purchase orders,[4] changing their price and requiring GOOD Meat to issue updated orders reflecting these changes. They also reaffirmed ABEC's right to certain GOOD Meat financial disclosures. "Except as modified" in the Amendments, the Bioreactor Development Agreement "remain[ed] in full force and effect and subject to all terms and conditions thereof, which are hereby ratified and confirmed in all respects."

### D. Defendants' Struggle to Pay Under the Agreements

Even after amending the Bioreactor Development Agreement, however, ABEC invoices continued to go unpaid. The promised updates to certain purchase orders mentioned in the Amendments never came. In light of this continued nonpayment, on March 2, 2023 ABEC sent a notice to Defendants that they were in breach of their contractual obligations. By March 7, ABEC was due almost $63 million on outstanding invoices.

### E. The Relationship Between Eat Just and Good Meat

The Amended Complaint describes GOOD Meat as "a wholly owned division" of Eat Just. Eat Just apparently formed GOOD Meat after the parties had begun to do business together. And while they are separate entities, they appear to be at least closely related. "Upon information and belief," ABEC alleges that they "are subject to common control by Josh Tetrick, the CEO of both [Eat Just] and [GOOD Meat]" and "have common ownership" such that

---

[4] Purchase orders 187860, 191507, 191509, 193749, 194919, and 196518.

"[GOOD Meat] is an enterprise of defendant [Eat Just] and is engaged in a common commercial endeavor with [Eat Just]." Indeed, Tetrick, in his capacity as CEO of Eat Just, signed a letter of intent ("LOI") from one of the company's lenders, Nexseer Capital, identifying as collateral for a loan thirty purchase orders "provided by [Eat Just]." These included at least four purchase orders subject to this suit[5]—one for the Pilot Plant Agreement, the other three among those whose delivery dates and prices were modified in the Amendments. That agreement also permitted "Nexseer to take a lien on all used equipment at the Alameda pilot facility as additional collateral," although the pilot agreement was between ABEC and GOOD Meat.

## II.    PROCEDURAL BACKGROUND

Having declared that Defendants were in material breach of their obligations under these contracts, ABEC filed a four-count complaint in the Court of Common Pleas of Northampton County, Pennsylvania. Defendants removed to the Eastern District of Pennsylvania on the basis of diversity jurisdiction. 28 U.S.C. §§ 1332, 1441. The Amended Complaint alleges: (1) breach of the Pilot Plant Agreement for failure to pay over $900,000 in outstanding balance on that contract; (2) breach of the Bioreactor Development Agreement and Amendments for failure to make tens of millions of dollars in payments on certain invoices, plus consequential damages; (3) in the alternative, that ABEC is entitled to payment on its "running account with Defendant [GOOD Meat];" and, (4) in the alternative, Eat Just "agreed to make sure that ABEC was paid for its work on four . . . purchase orders,"[6] so it is obligated to pay ABEC over $26 million due on those agreements.

Defendants now move to compel arbitration under the Bioreactor Development

---

[5] These were purchase orders 187859, 187860, 191507, and 191509.

[6] These were the purchase orders listed in the Nexseer LOI: purchase orders 187859, 187860, 191507, and 191509.

Agreement or, in the alternative, dismiss the Amended Complaint for failure to state a claim. Fed. R. Civ. P. 12(b)(6).

### III. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* When analyzing a motion to dismiss, the complaint must be construed "in the light most favorable to the plaintiff," with the question being "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). This means that the Court proceeds in three steps. First, the Court will "tak[e] note of the elements a plaintiff must plead to state a claim." *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021) (quotation omitted) (alteration in original). Second, the Court will "identify allegations that . . . are not entitled to the assumption of truth because those allegations are no more than conclusion[s]." *Id.* (internal quotation marks and citation omitted) (ellipsis and alteration in original). Third, the remaining well-pleaded facts are taken as true, and a determination is made as to whether those facts state a "plausible claim for relief." *Fowler*, 578 F.3d at 210-11.

"In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223,

230 (3d Cir. 2010).[7] A court may consider a document "*integral to or explicitly relied upon* in the complaint" without converting a motion to dismiss into one for summary judgment. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal quotation and citation omitted).

On a motion to dismiss, a complaint may be dismissed with prejudice and plaintiff may be denied leave to further amend his claims if amendment would be inequitable or futile. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002). "'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted." *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000). Simply stated, a court may dismiss a claim with prejudice if an amendment would still not cure the deficiency. *Id.* On the other hand, where, as here, one amended pleading already has been filed, further amendment may be allowed "only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).

## IV. DISCUSSION

### A. Motion to Compel Arbitration

GOOD Meat argues that all of ABEC's claims under the Bioreactor Development Agreement have to be arbitrated. The Federal Arbitration Act ("FAA") states that "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. It "establishes a national policy favoring arbitration when the parties contract for that mode of dispute resolution." *Preston v. Ferrer*, 552 U.S. 346, 349 (2008).

---

[7] Nowhere do Defendants dispute the authenticity of any of ABEC's exhibits.

Pursuant to that "liberal" policy, "courts must place arbitration agreements on an equal footing with other contracts . . . and enforce them according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citations omitted).

"[I]n deciding whether a party may be compelled to arbitrate under the FAA, [a court must] first consider '(1) whether there is a valid agreement to arbitrate between the parties and, if so, (2) whether the merits-based dispute in question falls within the scope of that valid agreement.'" *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 220 (3d Cir. 2014) (quoting *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 527 (3d Cir. 2009)).

In line with the FAA's equal-treatment principle, at the first step in this inquiry, "we turn to ordinary state-law principles that govern the formation of contracts." *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009) (internal quotation marks omitted). That means that, according to the Bioreactor Development Agreement, Delaware contract law applies here. Under that state's law, "the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." *Sarissa Cap. Domestic Fund LP v. Innoviva, Inc.*, 2017 WL 6209597, at *21 (Del. Ch. Dec. 8, 2017) (citation omitted); *see also Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010). "[M]anifestation of mutual assent is an external or objective standard for interpreting conduct." *Hyetts Corner, LLC v. New Castle County*, 2021 WL 4166703, at *7 (Del. Ch. Sept. 14, 2021) (quotation omitted); *see also Leeds v. First Allied Conn. Corp.*, 521 A.2d 1095, 1097 (Del. Ch. 1986) (identifying as the test for contract formation "whether a reasonable negotiator in the position of one asserting the existence of a contract would have concluded . . . that the agreement reached constituted agreement on all of the terms that the parties themselves regarded as essential and thus that that agreement concluded the negotiations and formed a contract"). At the

second step in this inquiry, "whether a particular dispute is within the class of those disputes governed by the arbitration clause . . . is a matter of federal law." *Century Indem.*, 584 F.3d at 524 (internal quotation marks and citation omitted). Any doubt "about the scope of arbitrable issues" should be resolved "in favor of arbitration." *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452 (2003) (quotation omitted).

Here, the Bioreactor Development Agreement plainly states that the parties will arbitrate "[a]ny dispute, controversy or claim arising out of or in connection with this Agreement, or the breach, termination, or invalidity thereof." GOOD Meat argues that nothing in the Amendments modified that provision, so it remains in force, and the parties should be compelled to arbitrate. ABEC counters that, at least with respect to the invoices listed therein, the Amendments displaced that language because "the parties contractually granted ABEC the right to . . . 'pursue any and all rights and remedies against [GOOD Meat], at law or in equity, with respect to [those invoices].'"

Delaware contract law dictates that, "where a new, later contract between the parties covers the same subject matter as an earlier contract, the new contract supersedes and controls that issue, if the two agreements conflict." *Cabela's LLC v. Wellman*, 2018 WL 5309954, at *4 (Del. Ch. Oct. 26, 2018) (citations omitted). Thus, where "there is no way for a party to comply with both dispute resolution provisions the later in time provision . . . supersedes the earlier provision." *BioVeris Corp. v. Meso Scale Diagnostics, LLC*, 2017 WL 5035530, *7 n.71 (Del. Ch. Nov. 2, 2017), *aff'd*, 202 A.3d 509 (Del. 2019).

While the Amendments' permissive language—ABEC merely "may pursue" payment in an action at law—does not place the company in a true bind between mutually-exclusive contractual provisions like in *BioVeris*, it still relates to "the same subject matter"—the proper

forum for resolving disputes relating to certain contracts—and thus supersedes the arbitration provision in the original Bioreactor Development Agreement as it relates to any invoices and purchase orders covered by the Amendments. *Compare Cabela's*, 2018 WL 5309954, at *4-5 (two contracts both regulating executives' work and contact with competitors covered the same subject matter and thus conflicted), *with Brady v. i2 Techs. Inc.*, 2005 WL 3691286, at *3 (Del. Ch. Dec. 14, 2005) (two contracts, one contemplating advancement of attorney's fees, and another contemplating indemnification, did not cover the same subject matter). This interpretation gives maximal effect to the provisions the parties bargained for in both contracts. *See Axis Reins. Co. v. HLTH Corp.*, 993 A.2d 1057, 1063 (Del. 2010) (citations omitted) ("[W]here a contract provision lends itself to two interpretations, a court will not adopt the interpretation that leads to unreasonable results, but instead will adopt the construction that is reasonable and that harmonizes the affected contract provisions."). Therefore, the later language in the Amendments governs, and, as a matter of Delaware law, there was no "valid agreement to arbitrate" disputes relating to the invoices and purchase orders mentioned in that agreement. *Flintkote*, 769 F.3d at 220 (citation omitted). GOOD Meat's Motion to Compel Arbitration therefore will be denied.[8]

### B. Motion to Dismiss

Having declined to compel arbitration in this case, the Court turns to Defendants' motions to dismiss. To state a claim for breach of contract under Delaware law,[9] a plaintiff must

---

[8] Because GOOD Meat's Motion to Compel Arbitration will be denied, the motion to stay pending arbitration will be denied as moot.

[9] The parties analyze this issue under Pennsylvania law, but the Bioreactor Development Agreement states that it "shall be governed by the substantive laws of the State of Delaware," a provision that the Amendments ratified. The Court will honor the choice of law of the parties as set forth in the agreement. In any event, the application of Delaware law comports with the requirement that a federal court sitting in diversity applies the choice-of-law rules of the forum state (here, Pennsylvania). *See Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 226 (3d Cir. 2007) (citing

plead: (1) the existence of a contract; (2) breach of that contract; and, (3) damages resulting from that breach. *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 883 (Del. Ch. 2009); *see Osborn*, 991 A.2d at 1158.

### i. GOOD Meat

GOOD Meat moves to dismiss the count in the Amended Complaint alleging breach of the Pilot Plant Agreement, arguing that East Just—and not it—was a party to that contract. *See Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 59 (Del. Ch. 2012) (identifying as a "basic contract principle[]" "that a person *not a party to [a] contract* cannot be held liable to it" (quotation omitted)). ABEC counters that GOOD Meat assumed liability for the invoice underlying its breach of contract claim relating to the Pilot Plant Agreement when it signed the Amendments. It is correct, but only with respect to the invoices mentioned in the Amendments and not those so mentioned. Therefore, GOOD Meat's Motion to Dismiss will be granted in part and denied in part.

Although an Eat Just employee signed purchase order 187859 for ABEC's work pursuant to the Pilot Plant Agreement, multiple invoices under that purchase order are identified in the Amendments. Invoice 24800 is among the Recent Past Due Invoices. Invoices 24817 and 24818 are among the Current Invoices that were soon to become due. Therefore, even if GOOD Meat was not expressly a party to the Pilot Plant Agreement, it assumed responsibility for

---

*Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 495-96 (1941)). In line with section 187 of the Restatement (Second) of Conflict of Laws, which provides for enforceability unless: (1) "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice;" or, (2) application of the law of the chosen state would be contrary to a fundamental policy of" another state with a greater interest in the issue, "Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them." *Gay v. CreditInform*, 511 F.3d 369, 389 (3d Cir. 2007) (first quoting Restatement (Second) Conflict of Laws § 187 (Am. L. Inst. 1971); and then quoting *Kruzits v. Okuma Machine Tool, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994)). Here, GOOD Meat is a Delaware corporation, so the chosen state has a substantial relationship to the parties. *See Ciena Corp. v. Jarrard*, 203 F.3d 312, 324 (4th Cir. 2000); *Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.*, 87 F.3d 604, 608 (2d Cir. 1996).

payment under these invoices when it acknowledged ABEC was due payment for them by signing the Amendments. With respect to these invoices, then, GOOD Meat cannot win dismissal of ABEC's claim for breach of the Pilot Plant Agreement by arguing that it had no liability under that contract. Its liability instead flows from the Amendments, to which it was a party. As it relates to those invoices, GOOD Meat's Motion to Dismiss will be denied.

That does not take care of the entirety of ABEC's claim for breach of the Pilot Plant Agreement though. ABEC also alleges that it is due payment for invoice 24845, which is attached as an exhibit to the Amended Complaint.[10] While not mentioned in the Amendments, this invoice is expressly billed to GOOD Meat under purchase order 187859. But GOOD Meat is correct that simply sending an invoice to a party is not evidence of the recipient's contractual liability. Therefore, ABEC's claim under the Pilot Plant Agreement will be dismissed without prejudice as it relates to invoice 24845.

### ii. Eat Just

Eat Just moves to dismiss two counts of the Amended Complaint—one alleging breach of the Bioreactor Development Agreement, the other alleging breach of a promise to pay for work done under certain purchase orders referenced in the Nexseer LOI. For the reasons that follow, Eat Just is entitled to dismissal on the latter count only.

#### a. Liability Under the Bioreactor Development Agreement

Similar to GOOD Meat's argument regarding the Pilot Plant Agreement, Eat Just argues that the Bioreactor Development Agreement and its Amendments constitute a contract between ABEC and GOOD Meat only, so it cannot be held liable for any breach and should be dismissed

---

[10] ABEC refers to this invoice in its opposition to GOOD Meat's Motion to Dismiss as invoice 24855, but, based on its exhibits and Amended Complaint, that appears to have been a typo.

from this case.[11]  ABEC counters, relying on "the doctrine of enterprise liability," that GOOD Meat is merely an intentionally undercapitalized alter ego of Eat Just.  Therefore, per ABEC, the corporate veil should be pierced and it should be allowed to proceed on the theory that Eat Just is liable for what is ostensibly GOOD Meat's breach.  While a close question, ABEC has plausibly alleged on these facts that GOOD Meat is Eat Just's alter ego and that Eat Just therefore is a party to the Bioreactor Development Agreement.

"Enterprise liability," where cognizable, stands for the proposition "that, just as a corporation's owner or owners may be held liable for judgments against the corporation when equity requires, so may affiliated or 'sister' corporations—corporations with common ownership, engaged in a unitary commercial endeavor—be held liable for each other's debts or judgments." *Mortimer v. McCool*, 255 A.3d 261, 266 (Pa. 2021).  Unlike Pennsylvania, Delaware does not expressly recognize enterprise liability as a "complement to" the traditional grounds for piercing the corporate veil.  *Id.* at 274 n.43, 284 (listing states that recognize the theory in some form or another).  It does, however, allow the corporate veil to be pierced "where there is fraud or where a subsidiary is in fact a mere instrumentality or alter ego of its owner," *Geyer v. Ingersoll Pubs. Co.*, 621 A.2d 784, 793 (Del. Ch. 1992), which is what ABEC maintains is the case here.

"Persuading a Delaware court to disregard the corporate entity is a difficult task." *Harco Nat. Ins. Co. v. Green Farms, Inc.*, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989) (citation omitted).  "It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotation marks and citations omitted).  "In certain

---

[11] Eat Just does not contest the other elements of a breach of contract claim with respect to ABEC's allegations of breach of the Bioreactor Development Agreement.

situations, however, the corporate veil can be pierced, as a tool of equity, to disregard the existence of a corporation and impose liability . . . ." *Blair v. Infineon Techs. AG*, 720 F. Supp.2d 462, 469 (D. Del. 2010) (citations omitted). Among those is the "alter ego theory of liability," whereby "plaintiffs must essentially demonstrate that, in all aspects of the business, the [] corporations actually functioned as a single entity and should be treated as such" and "alleg[e] an element of fraud or injustice." *Id.* at 470 (quoting *Person v. Component Tech. Corp.*, 247 F.3d 471, 485 (3d Cir. 2001)); *see also Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 266 (D. Del. 1989). "[B]ecause Delaware public policy does not lightly disregard the separate legal existence of corporations, a plaintiff must do more than plead that one corporation is the alter ego of another in conclusory fashion in order for the Court to disregard their separate legal existence." *MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455, at *11 (Del. Ch. Dec. 30, 2020).

Delaware courts analyze several factors when considering two corporations are in fact a single entity:

> whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

*Harco*, 1989 WL 110537, at *4 (quoting *United States v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1104 (D. Del. 1988)); *see also Manichaean Cap., LLC v. Exela Techs., Inc.*, 251 A.3d 694, 706 (Del. Ch. 2021). Turning to the "fraud or injustice" element, "the requisite injustice or unfairness is not that the parent corporation committed an actual fraud or sham, but just something that is similar in nature." *Blair*, 720 F. Supp.2d at 471 (internal quotation marks and citation omitted). "[F]raud, strictly speaking, is not the only basis . . . for piercing the corporate

14

veil," but "[t]he law requires that fraud or injustice be found in the defendants' use of the corporate form." *Mobil Oil*, 718 F. Supp. at 268-69. The bar plaintiffs must clear is lower at the motion-to-dismiss stage. *See Blair*, 720 F. Supp.2d at 471 ("The question at bar is not whether plaintiffs' claims will ultimately succeed on their merits, but whether the facts as pled are sufficient to warrant discovery.").

Here, ABEC's allegations "plausibly give rise to an entitlement to relief" for breach of contract against Eat Just through a piercing the corporate veil rubric. *Iqbal*, 556 U.S. at 679. ABEC has plausibly alleged that Eat Just and GOOD Meat are a single entity. Although the vast majority of ABEC's allegations that GOOD Meat is an alter ego of Eat Just are pled "upon information and belief" only, the Court can accept such allegations where the relevant "information . . . is uniquely within [Defendants'] possession." *Lincoln Benefit Life Co. v. AEI Life, LLC*, 800 F.3d 99, 107 n.31 (3d Cir. 2015); *see also Chandler v. La-Z-Boy, Inc.*, 621 F. Supp.3d 568, 575 n.5 (E.D. Pa. 2022). That said, to be credited, such statements cannot be "boilerplate and conclusory allegations." *McDermott v. Clondalkin Grp., Inc.*, 649 F. App'x 263, 267-68 (3d Cir. 2016) (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002)).

Applying those rules, many of ABEC's allegations made "upon information and belief" can be credited. Factual information to support ABEC's allegations "upon information and belief" that: (1) the two companies "are subject to common control" by Tetrick; (2) the two companies "have commingled corporate assets;" (3) GOOD Meat "did not regularly prepare financial reports in accordance with generally accepted accounting principles and failed to properly administer its corporate form as" separate from Eat Just; (4) "[GOOD Meat] is allegedly capitalized with [Eat Just] assets and opportunities, and used [Eat Just] resources;" (5) stock in

15

the two companies are interchangeable; and, (6) Tetrick "misrepresented to ABEC the financial situation as to [GOOD Meat]," all would be uniquely in Eat Just's possession and thus can be considered in evaluating Eat Just's motion to dismiss. And on top of these allegations, ABEC has produced the Nexseer LOI, from which one could plausibly infer that Eat Just had the authority to uses GOOD Meat assets—purchase orders and facilities—as its own by putting them up as collateral.

ABEC also has pleaded "an overall element of fraud, injustice, or unfairness." *Blair*, 720 F. Supp.2d at 471 (citation omitted). Specifically, ABEC alleges in the Amended Complaint that Eat Just used the formal distinction between it and GOOD Meat to avoid liability for the Bioreactor Development Agreement and induced ABEC to continue its relationship with it by misrepresenting the true nature and financial health of GOOD Meat. At this early stage in the litigation, it is proper to allow the question of whether it is warranted to pierce the corporate veil between GOOD Meat and Eat Just to proceed. Eat Just's Motion to Dismiss therefore will be denied.

### b. <u>Liability for the Purchase Orders Referenced in the Nexseer LOI</u>

Finally, Eat Just also argues that the final count in the Amended Complaint, a request in the alternative that it pay ABEC at least for the balance on the four purchase orders mentioned in the Nexseer LOI, should be dismissed. In the Amended Complaint, ABEC alleged that "EJ agreed to make sure that ABEC was paid for its work on four ABEC purchase orders with [GOOD Meat]" in order to "secure . . . financing from Nexseer . . . and show[] investors that the work on the Project was proceeding." The Nexseer LOI, standing alone, does not give rise to any contractual liability from Eat Just to ABEC. And the Amended Complaint makes only conclusory reference to any agreement between ABEC and Eat Just in which Eat Just contracted to take on GOOD Meat's obligations to pay for work done under these purchase orders.

Therefore, ABEC's claim that it is entitled to payment for the purchase orders referenced in the Nexseer LOI because of this alleged promise by Eat Just will be dismissed without prejudice.

## V. CONCLUSION

For the foregoing reasons, Defendant GOOD Meat's motion to compel arbitration will be denied. GOOD Meat's motion to dismiss will be granted in part and denied in part. Eat Just's motion to stay pending arbitration will be denied. Eat Just's motion to dismiss will be granted in part and denied in part. An appropriate order follows.

**BY THE COURT:**

**/s/Wendy Beetlestone, J.**

_____
**WENDY BEETLESTONE, J.**