**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ABEC, INC.,** | **CIVIL ACTION** |
|       **Plaintiff,** | |
| **v.** | |
| **EAT JUST, INC. AND GOOD MEAT, INC.,** | **NO.  23-cv-1091** |
|       **Defendants.** | |

**MEMORANDUM OPINION**

Plaintiff ABEC and Defendants Eat Just, Inc. and Good Meat, struck a deal—the Bioreactor Agreement ("the Agreement")—regarding the fabrication of machines to grow cultivated meat.  Pursuant to the Agreement, ABEC undertook to build and deliver to Defendants certain cultured-meat-bioreactor equipment.[1]  The relationship soon turned rancid and ABEC sued Eat Just, Inc. and Good Meat (henceforth together "Counterclaimants").  They in turn asserted counterclaims, the following of which ABEC now seeks to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6): breach of contract, conversion; replevin, and a request for declaratory judgment that the parties never actually entered into certain amendments to the Agreement.  For the following reasons, ABEC's Motion will be granted in part and denied in part.

## I.   FACTUAL BACKGROUND

The Agreement divided the project into five stages and provided that "[u]pon completion

---

[1] Specifically, bioreactor trains and associated materials and support equipment, raw materials and components for bioreactor fabrication, and additional equipment.

of each Stage (or earlier as [Good Meat] and ABEC agree), ABEC w[ould] confirm pricing and

[Good Meat] w[ould] provide formal approval and funding to proceed to subsequent stages."

Under the Agreement, according to the Counterclaimants, "ABEC promised to provide a price

for each Stage that will align with the value ABEC would typically attribute to a partner-based

product development and execution effort."  Counterclaimants allege that they have now paid

ABEC approximately $80,369,066 for equipment but ABEC has not delivered any of it.

Counterclaimants also allege that as the project progressed they began to face "financing

hurdles" and so recommended reevaluating the parties' approach to the project.  Although all

parties agree that they began to negotiate potential amendments to the Agreement ("the

Amendments") they disagree as to the upshot of those negotiations:  Counterclaimants maintain

that the Amendments were never finalized and executed; ABEC (in its claims) alleges they were.

## II.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A

claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice."  *Id.*  The same standard is used when analyzing a plaintiff's motion

to dismiss a defendant's counterclaims.  *Patel v. Dhaduk*, 839 F. App'x 715, 720 (3d Cir. 2020)

("In analyzing a 12(b)(6) motion to dismiss, we accept as true the well-pleaded facts of the

counterclaim and disregard legal conclusions.") (citing *Davis v. Wells Fargo*, 824 F.3d 333, 341,

351 (3d Cir. 2016)).  The lens to construe the countercomplaint is "in the light most favorable to

2

the [counterclaim] plaintiff[,]" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009),

with a view to answering the question as to "whether, under any reasonable reading of the

complaint, the [counterclaim] plaintiff may be entitled to relief." *Id.* The Court "tak[es] note of

the elements [that] must [be] plead to state a claim[,]" *Oakwood Lab'ys LLC v. Thanom*, 999

F.3d 892, 904 (3d Cir. 2021) (quotation omitted) (alteration in original) then—taking all non-

conclusory well-pleaded facts as true—determines whether those facts state a "plausible claim

for relief." *Fowler*, 578 F.3d at 210-11.

## III.     DISCUSSION

### A.  Counterclaim I: Breach of Contract (Failure to Deliver)

Counterclaimants' breach-of-contract claim is premised on their allegation that although

they have paid ABEC over eighty million dollars, and although ABEC has the equipment

Counterclaimants say they paid for, ABEC has refused to deliver it. This, Counterclaimants

maintain, is a breach of the Agreement.

In Delaware,[2] the elements of a breach-of-contract claim are: (1) a contractual obligation;

(2) a breach of that obligation; and, (3) resulting damages. *Interim Healthcare, Inc. v. Spherion

Corp.*, 884 A.2d 513, 548 (Del. Super. 2005), *aff'd*, 886 A.2d 1278 (Del. 2005). As to the first

requirement, the parties do not dispute that the Agreement bound them and obligated them in

certain ways. And the third requirement—resulting damage—is adequately pled:

Counterclaimants say that they paid $80,369,066 under the Agreement and received nothing for

it. Counterclaimants allege that Stage 5 of the project had not yet begun when the venture fell

---

[2] The Bioreactor Development Agreement states that it "shall be governed by the substantive laws of the State of Delaware," a provision that the Amendments ratified. As explained in the Court's December 21, 2023, opinion, the Court will honor the choice of law of the parties as set forth in the agreement.

apart.  The Agreement priced Stage 1 (a feasibility analysis) and Stage 2 (conceptual design) together at $2,200,000 total.  Counterclaimants say that Stage 5 (full-scale construction) never began.  It is reasonable here to infer that Counterclaimants allegedly paid ABEC the remaining $78,169,066 for *something* under Stage 3 (design validation) and Stage 4 (construction and testing of the first bioreactor) pursuant to the Agreement.  They have alleged damages that are "causally related" to the breach and "warrant[] a remedy[.]"  *Garfield on behalf of ODP Corp. v. Allen*, 277 A.3d 296, 328 (Del. Ch. 2022).

The focus, thus, is on whether Counterclaimants have sufficiently alleged the second element: breach of a contractual obligation.  Their claim boils down to this:  The Agreement obligated them to pay ABEC, and it obligated ABEC to build and deliver certain property; they paid, but ABEC delivered nothing.  They highlight one particular provision from the Agreement.  ABEC, they allege, agreed to:

> "timely prepare and provide to [Counterclaimants] all Prototypes, other Deliverables and/or other results of the Project."

In its Motion to Dismiss ABEC makes two central contentions and two supporting contentions.

Its first central contention is that it did not breach the Agreement because no delivery obligation under the Agreement ever vested.  ABEC acknowledges the Agreement's requirement that it "timely prepare and provide to [Counterclaimants] all Prototypes, other Deliverables and/or other results of the Project," but it contends the Agreement did not obligate it to deliver anything until Stage 5 of the project (which the parties had not reached by the time the venture dissolved) because in the Agreement's Statement of Work only Stage 5 contemplates "shipping."  Although Counterclaimants grant that Stage 5 in the Statement of Work calls for the "shipping" of certain property, they respond that earlier stages necessarily required delivery of some

property (for instance, Stage 4 contemplated "construction" and "installation," which Counterclaimants argue could not occur without delivery).  Counterclaimants' reading is plausible enough to withstand a motion to dismiss:  It is reasonable to infer that "installation" of certain property would require delivery of that property, given that because the provision "must be construed in the light most favorable to the non-moving party."  *VLIW Tech., LLC*, 840 A.2d at 615.  Counterclaimants' reading—that under the Agreement their payment entitles them to the delivery of some "[d]eliverables"—is plausible.

ABEC's second central contention is that Counterclaimants have not averred enough specific facts about the Agreement to state a claim.  In particular, ABEC argues, Counterclaimants have not shown that the Agreement specifically contemplates delivery of any particular purchase order, or that it specifically details pricing or particular categories of deliverable equipment.

But the Agreement is purposely designed to be flexible as to these terms, and its flexibility does not doom Counterclaimants' claims.[3]  The Agreement says, for instance, that ABEC's "confirm[ation of] pricing" and Good Meat's "provi[sion of] formal approval and funding to proceed to subsequent Stages" would be contingent on the "completion of each Stage"; that "[i]t [wa]s understood that as a development effort there [we]re various technical and commercial unknowns"; that Good Meat could, but did not have to, choose to "drive project acceleration through more aggressive investment"; and that while "Stages 1 & 2 w[ould] be priced with this proposal," Stages 3-5 would "be priced as the results of the previous Stages

---

[3] Counterclaimants did not attach the Agreement to their pleading, but ABEC attached it to its complaint.  Neither party disputes the document's authenticity, and the Court may consider an extrinsic document that is "integral to or explicitly relied upon in" the pleading.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

provide[d] insight to the needs in Stage 3 and beyond."  In short, the venture's pricing beyond Stage 2 was open-ended and flexible by the parties' design—it gave ABEC room to account for the "technical and commercial unknowns" associated with greenfield development, and it gave Eat Just and Good Meat flexibility to adjust their "investment" as the project proceeded.

Considered against the backdrop of the Agreement's open-endedness, and the requirement that at this point in the litigation the Court must draw all inferences in favor of Counterclaimants,  *See McTernan v. City of York, Penn.*, 577 F.3d 521, 526 (3d Cir. 2009); *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003) ("Dismissal, pursuant to Rule 12(b)(6), is proper *only* if the [moving party's] interpretation is the only reasonable construction as a matter of law."), Counterclaimants have sufficiently alleged that they paid pursuant to the Agreement, that the Agreement entitled them to certain property, and that no property was delivered to them.

Neither of ABEC's two supporting arguments alters this conclusion.  The first is that Counterclaimants "fail[ed] to identify the contract or agreement [] they claim ABEC breached." Yet ABEC also acknowledges that Counterclaimants "refer[] to the Agreement as the contract that was purportedly breached," and of course ABEC directs the rest of its argument to Counterclaimants' reading of the Agreement.  ABEC's real argument here seems to be not that Counterclaimants failed to identify an agreement, but rather that the agreement they identified— the Bioreactor Agreement—"did not impose [the] obligations on ABEC that relate to the purchase orders."  In other words, ABEC argues not that Counterclaimants failed to identify an agreement whatsoever, but that the Agreement they identified does not mean what they say it means.  This argument fails for the reasons above.

ABEC's second supporting argument is that the Agreement's integration clause defeats

Counterclaimants' breach-of-contract claim.  This argument does not stand on its own, but rather also serves ABEC's broader contention that Counterclaimants have pleaded insufficient specifics regarding the entitlements and obligations of the Bioreactor Agreement.  In essence ABEC argues that the terms of the Agreement pled by Counterclaimants are not enough to state a claim, and because the contract is fully integrated—i.e., that the parties intended the Agreement to be an exhaustive recitation of its terms—Counterclaimants could not possibly state a claim pursuant to the Agreement.  But because, for the reasons above, Counterclaimants have averred enough to state a claim under the Agreement, the integration clause poses no additional problem at this stage.

For these reasons, ABEC's Motion will be denied as to Counterclaimants' claim for breach-of-contract (failure to deliver).

### B.  Counterclaims III and IV: The Tort Counterclaims

Counterclaimants bring two tort claims as to the property: for Conversion and Replevin. The claims work together— Counterclaimants argue that certain property resulting from the deal with ABEC belongs to them, that ABEC is unlawfully maintaining possession of their property, and that they are entitled to the property's delivery.

As to Conversion, Counterclaimants argue that they have a property interest in the Undelivered Equipment, that they demanded the Undelivered Equipment, and that ABEC refused the demand.  And they contend that ABEC "wrongful[ly] posess[ed] or dispossess[ed]" the property, causing them to suffer damages.  As to Replevin, Counterclaimants allege that ABEC "continuously possessed or was otherwise able to deliver" the Undelivered Equipment, that they "tendered payment for the Undelivered Equipment," that they had a right to immediate possession of the Undelivered Equipment, and that they therefore seek to replevy it.

7

In seeking to dismiss these claims, ABEC essentially argues that Counterclaimants have not properly raised any tort claims at all because they do not allege that ABEC "violated a legal duty independent from [its] contractually-imposed duties."  Counterclaimants' tort claims are impermissible, maintains ABEC, under Pennsylvania's Gist-of-the-Action Doctrine, which prohibits putative tort claims that are really contract claims in disguise; and its Economic-Loss Doctrine, which prohibits recovery in tort for losses arising in contract that are purely economic in nature.

Counterclaimants urge that their tort counterclaims arise not under Pennsylvania law but under Delaware law (and that therefore at least the Gist-of-the-Action Doctrine does not apply because it is a creature of Pennsylvania law and does not exist under Delaware law).  Which party's position prevails hangs on a choice-of-law analysis.[4]

A federal court sitting in diversity applies the choice-of-law rules of the forum state (here, Pennsylvania).  *See Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 226 (3d Cir. 2007) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 495-96 (1941)).  Before resolving a potential conflict-of-laws issue, though, the Court must determine whether there is "actually . . . a conflict between the potentially applicable bodies of law."  *Lucker Mfg., A Unit of Amclyde Engineered Prod., Inc. v. Home Ins. Co.*, 23 F.3d 808, 813 (3d Cir. 1994).  If not, then "there is a 'false conflict' and the court need not decide the choice[-]of[-]law issue."  *Id.*

Turning first to the Gist-of-the-Action Doctrine:  Under Pennsylvania law, the Gist-of-the-Action Doctrine "ensure[s] that a party does not bring a tort claim for what is, in actuality, a

---

[4] As noted above, the Bioreactor Agreement itself is "governed by the substantive laws of the State of Delaware." Neither party avers any agreement as to the governing forum for any putative tort claims between them.

claim for a breach of contract." *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 60 (Pa. 2014). *Bruno*

explains neatly:

> If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—*i.e.*, a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract. If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort.

*Id.* at 68. The "critical determinative factor in determining whether [a] claim is truly one in tort,

or for breach of contract" is "the nature of the duty alleged to have been breached, as established

by the underlying averments supporting the claim in a plaintiff's complaint." *Id.* It is the

substance of the allegations that matters—a plaintiff's choice to label a particular count as arising

out of contract or founded in tort does not control.

Counterclaimants are correct that there is no Gist-of-the-Action Doctrine in Delaware.

But there is a Bootstrapping Doctrine. "Under the Bootstrapping Doctrine, a plaintiff bringing a

claim based upon breaches of contract must sue in contract, not in tort." *Uppal v. Waters*,

2016 WL 4211774, at *3 (Del. Super. Aug. 9, 2016). In other words, "Delaware courts will not

permit a plaintiff to 'bootstrap' a breach[-]of[-]contract claim into a tort claim merely by

intoning the *prima facie* elements of the tort while telling the story of the defendant's failure to

perform under the contract." *Id.* For instance, a plaintiff in Delaware could not transform a

breach-of-contract claim into a fraud claim just by claiming "the parties had a contract" and the

defendant "intended not to follow through with its obligations" under the contract. *Id.* In other

words, "[t]o be viable, [a] tort claim must involve violation of a duty which arises by operation

of law and not by the mere agreement of the parties." *Cornell Glasgow, LLC v. La Grange*

*Properties, LLC*, 2012 WL 2106945, at *8 (Del. Super. Ct. June 6, 2012) (quotations removed).[5]

Here, there is no salient substantive difference between Pennsylvania's Gist-of-the-Action Doctrine and Delaware's Bootstrapping Doctrine. Counterclaimants' tort claims will fail under one to the same extent they will fail under the other, so there is no actual conflict between Pennsylvania and Delaware regarding Pennsylvania's Gist-of-the-Action doctrine.

Likewise with the Economic-Loss Doctrine. In Pennsylvania, the Economic-Loss Doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 671 (3d Cir. 2002), abrogated on other grounds by *Earl v. NVR, Inc.*, 990 F.3d 310 (3d Cir. 2021).[6] The extent of the Delaware rule is identical: Delaware's Economic-Loss Doctrine "prohibits a party from recovering in tort for economic losses, the entitlement to which flows only from [a] contract." *Israel Disc. Bank of New York v. First State Depository Co., LLC*, 2012 WL 4459802, at *14 (Del. Ch. Sept. 27, 2012), *aff'd*, 86 A.3d 1118 (Del. 2014). It "requires a plaintiff to sue in contract and not in tort where an action is based entirely on a breach of the terms of a contract between the parties and not on a violation of an independent duty imposed by law." *Id.*

---

[5] Other Delaware cases emphasize the same point without invoking any named doctrine. *See, e.g.*, *Preferred Inv. Servs., Inc. v. Fast Bail Bonds, LLC*, 2014 WL 5761123, at *2 (Del. Super. Oct. 27, 2014) (dismissing putative tort claims because the plaintiff had not "identified an independent duty," either "statutory or at common law," and therefore "[t]he relationship between Plaintiff and Defendants [wa]s contractual and Plaintiff's tort claims ar[o]se from Defendants['] alleged failed performance under the agreement"); *Heronemus v. Ulrick*, 1997 WL 524127, at *3 (Del. Super. July 9, 1997) (quoting *Garber v. Whittaker*, 174 A. 34, 36 (Del. Super 1934)) ("[W]here the action is based entirely on a breach of the terms of a contract between the parties, and not on a violation of some duty imposed by law, an action on the case will not lie, and the plaintiff must sue, if at all, in contract.").

[6] *Werwinski* explained the Economic-Loss Doctrine and held that it barred putative tort claims arising out of contract, including those brought under Pennsylvania's Unfair Trade Practices and Consumer Protection Law. In *Earl* the court explained that Pennsylvania law had changed since *Werwinski*: Now, the court explained, the Economic-Loss Doctrine "gives way if there is a statutory basis to impose liability for economic losses" like that provided by the UTPCPL. *Earl*, 990 F.3d at 313 (quotations removed). *Earl* left the Economic-Loss Doctrine intact in nonstatutory contexts; in fact, it noted that the Pennsylvania Supreme Court had clarified that the Economic-Loss Doctrine is "well-established" in Pennsylvania. *Id.* (quotations removed).

(quotations removed).

Counterclaimants' tort claims fail under Pennsylvania's Gist-of-the-Action or Delaware's Bootstrapping Doctrines, on the one hand, or either state's Economic-Loss Doctrine, on the other. Counterclaimants do not establish any right to the disputed equipment apart from that arising from the Agreement. In fact, in their Conversion counterclaim, Counterclaimants seem to acknowledge as much—they say that "*[u]nder the Agreement*, GOOD Meat has paid $80,369,066 to ABEC," that "GOOD Meat has a property interest in the Undelivered Equipment," and that "GOOD Meat has a right to immediate possession of the Undelivered Equipment" (emphasis added). But they aver no (noncontractual) facts to support these allegations. Instead, they simply conclude that "GOOD Meat was deprived of its interest in the property by ABEC's wrongful possession or dispossession, and, as a result, suffered damages." This conclusory summary does not establish a noncontractual right to any property. Counterclaimants' Replevin claim contains even less: They say that GOOD Meat "tendered payment" (presumably, under the terms of the Agreement) and "has a right to the immediate and exclusive possession" of the equipment. But they do not supply any facts establishing a noncontractual entitlement to the property.[7]

Accordingly, ABEC's motion will be granted as to Counterclaimants' conversion and

---

[7] In their Response Counterclaimants cite *Wagner v. Hendry*, 2000 WL 238009 (Del. Ch. Feb. 23, 2000), for the proposition that "[e]quitable considerations" entitle them to possession of the property because they "paid valuable consideration for it." But *Wagner* does not apply: It is a contract case which does not address either conversion or replevin.

Counterclaimants also urge that ABEC has acknowledged their property right to certain equipment by implication, because ABEC furnished information about the property to them so that they could "secure a capital expenditure loan" using the "Undelivered Equipment as collateral." But Counterclaimants' intent to use the property as collateral does not itself establish a violation of any noncontractual "broader social duty owed to all individuals," *Bruno*, 106 A.3d at 68, or "of an independent duty imposed by law," *Israel Disc. Bank of New York*, 2012 WL 4459802, at *14.

replevin counterclaims, which will be dismissed without prejudice.[8]

### C.  Counterclaim V: Declaratory Judgment

Counterclaimants' final request is for a declaratory judgment that the Amendments to the Agreement were never properly executed, and therefore are not binding.

As Counterclaimants explain in their response to ABEC's Motion, the status of the Amendments matters to Counterclaimants because, they say, it would take this dispute out of court and into arbitration.  Counterclaimants allege that ABEC "slipped advantageous terms into" the proposed Amendments, "asserted overwhelming and incessant pressure" on Counterclaimants to execute the Amendments, and then "availed itself of the amendments['] new, self-serving terms.  Counterclaimants position is that "one of the self-serving terms ABEC added to the purported amendment[s] would displace the [Bioreactor] Agreement's arbitration provision, at least with respect to certain sums in dispute," and therefore, if the Court declares that the Amendments are not enforceable, the original Agreement "will control and likely require the Parties to arbitrate this dispute."

The process of amending the Agreement was messy.  Counterclaimants allege that when they first encountered "financing hurdles," ABEC circulated "draft amendments" that, they claim, ABEC unilaterally declared constituted an "agreement in princip[le]."  Counterclaimants claim they did not agree to ABEC's proposal but instead sent ABEC their own proposed

---

[8] Counterclaimants argue that because they are permitted to plead alternative claims (here, some in contract and some in tort), the Gist-of-the-Action Doctrine "do[es] not, at this stage, preclude simultaneous breach[-]of[-]contract and conversion and replevin claims."  They are correct that at this stage they may bring simultaneous claims—even inconsistent ones.  But simultaneity is not the problem.  The Gist-of-the-Action Doctrine does not bar simultaneous claims but rather *fundamentally identical* tort and contract claims.  It bars contract claims masquerading as tort claims.  The issue is not that Counterclaimants brought both contract and tort claims.  The issue is that in essence they have only brought a contract claim.

amendments, to which "ABEC responded with numerous proposed changes." Counterclaimants say the parties exchanged comments on the proposed amendments and Counterclaimants "circulated a signed copy" that included a "cover message" reading, "Pending additional comments from legal." The next day, Counterclaimants say, ABEC responded, "I did not see any requested revisions from [Counterclaimants], so we will move forward as executed." Counterclaimants say the parties exchanged further communications along these lines, in which ABEC announced the project was "moving forward" with "the executed document" even as Counterclaimants insisted their proposed revisions were "still pending legal comments."

In short, Counterclaimants claim that ABEC simply decided to start acting as though the Amendments were binding but in fact the parties never finally executed the Amendments. Now, Counterclaimants ask the Court to resolve the dispute over the Amendments by issuing a declaratory judgment that the Amendments were never validly executed. ABEC does not respond to Counterclaimants' substantive argument that the Amendments are not binding but contends that Counterclaimants did not meet the standard for a declaratory judgment. A declaratory judgment, ABEC argues, requires an "actual controversy." ABEC suggests that Counterclaimants' declaratory-judgment claim is "merely a request for relief [for their other counterclaims]," and it argues that because Counterclaimants have failed to state their other counterclaims, they have failed to sufficiently allege facts suggesting they are entitled to a declaratory judgment.

A declaratory judgment is appropriate only when a "case or controversy" of "sufficient immediacy and reality" exists. Wright & Miller, Existence of Actual Controversy, 10B Fed. Prac. & Proc. Civ. § 2757 (4th ed.) And "[t]here is little difficulty in finding an actual controversy if all of the acts that are alleged to create liability already have occurred," because

"[t]he court is then merely being asked, as in any litigation, to determine the legal consequences of past events." *Id.* Counterclaimants believe the enforceability of the Amendments will determine whether this matter must be arbitrated.[9]

An actual controversy meets the following criteria:

1. It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief;

2. [I]t must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim;

3. [T]he controversy must be between parties whose interests are real and adverse; and,

4. [T]he issue involved in the controversy must be ripe for judicial determination.

*Gannett Co. v. Bd. of Managers of the Delaware Crim. Just. Info. Sys.*, 840 A.2d 1232, 1237 (Del. 2003). Here, the fourth criterion is not met. A court may decline to issue a declaratory judgment before the underlying controversy has "matured to a point where judicial action is appropriate." *Ridley v. Bayhealth Med. Ctr., Inc.*, 2018 WL 1567609, at *10 (Del. Super. Mar. 20, 2018). The Court's discretion is guided by (among other factors) "the prospect of future factual development that might affect the determination made." *Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 623 A.2d 1133, 1137 (Del. Super. 1992). Here, the declaratory judgment Counterclaimants seek would not result in a prompt resolution, and the facts are not "sufficiently developed to allow the Court to render a declaratory judgment which will end the controversy among the parties." *Id.* at 1140.

In any case, the Court may decline to render a declaratory judgment if it would "not

---

[9] The Court previously denied Counterclaimants' Motion to Compel Arbitration under the Agreement (ECF No. 51) before the dispute over the status of the Amendments arose.

terminate the uncertainty or controversy giving rise to the proceeding." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 744 (Del. 2006).  Declaratory judgments are final disposals. They "avoid the accrual of unnecessary damages to a party unsure of his rights and to afford him an early adjudication without waiting until his adversary should see fit to begin suit, after damage has accrued." *Lear Siegler, Inc. v. Sargent Indus., Inc.*, 374 A.2d 273, 277 (Del. Super. 1977).  Here, Counterclaimants do not argue that the declaratory judgment they seek would "terminate the uncertainty or controversy"—at most they say the uncertainty and controversy regarding the parties' doomed venture would shift to arbitration.  But it would not be resolved.

Accordingly, a declaratory judgment as to the Amendments will not issue.  ABEC's Motion will be granted as to Counterclaimants' declaratory-judgment claim, which will be dismissed without prejudice.

## IV.    CONCLUSION

For these reasons, Counterclaimants' Motion will be granted in part and denied in part. An appropriate order follows.

BY THE COURT:

/s/Wendy Beetlestone, J.

_____
**WENDY BEETLESTONE, J.**